KELSEY *v.* BOARD OF FIRE & WATER COMMISSIONERS OF MARQUETTE.

1. WATER RATES—LIABILITY OF OWNER—RULES AND REGULATIONS —WAIVER.

The right secured to a board of water commissioners by charter to treat with the owner of an office building, rather than with the several tenants, is not waived by its superintendent's unauthorized act in assessing water rates, at the owner's request, to the tenants, upon the understanding that the owner should remain liable if the tenants failed to pay.

2. SAME.

The duty of furnishing water separately to each tenant of a building, and collecting rates from each as a separate consumer, cannot be imposed by the owner of the premises on the board of water commissioners by furnishing at his own expense, for each room, shut-offs with locks and keys, and then tendering the keys to the commissioners.

Appeal from Marquette; Stone, J. Submitted April 30, 1897. Decided May 28, 1897.

Bill by Charles Kelsey to restrain the Board of Fire & Water Commissioners of the city of Marquette from shutting off the water from a certain building. From a decree for complainant, defendant appeals. Reversed.

Complainant, a resident of the city of Marquette, occupied as tenant an office on the second floor in the building known as the "Nester Block," in the said city. He is also the agent of Morrison & Scott, the owners of the building, and has charge thereof. The building has a frontage of five stores, and is four stories high. The basement is occupied by a barber shop and offices; the first story, by stores; the second, third, and fourth, by offices. The complainant's office, as are also most of the others, is supplied with water by the defendant, and has been ever since the erection of the building. Each

office has a wash-bowl. Water is also furnished for the engine and boilers with which the building is heated, for running the elevator, and for closets. Since its erection, until 1895, the defendant was in the habit of issuing permits and rendering bills to the occupants of each office, which have generally been paid by them. Bills for the boiler, closets, and elevator have been rendered to the owners of the building. In May, 1895, after the dispute arose, Morrison & Scott supplied every water fixture in the block with shut-offs, with lock and key, and tendered these keys to the defendant, with authority from them to shut off any tenant who did not pay for the water. The leases between Morrison & Scott and their tenants require each tenant to pay "all gas, electric light, and water rates properly chargeable against said premises." There was a single service pipe from the street main to the building, and, from this service pipe, pipes were carried to the different rooms and stores. A shut-off was placed near the sidewalk in the street, so that the water could be shut off from the building. It appears that some of the tenants did not pay the water rates, and, when Morrison & Scott purchased the building, they paid the amounts which were in arrears. In 1894 the defendant concluded to deal only with the owners of the building, to charge the rates to them, and to shut off the water if they were not paid. Bills were so rendered in 1895, and trouble arose, which was finally settled by the payment of the bills. In May, 1896, the defendant again threatened to shut off the water because of unpaid bills. The complainant tendered the amount due upon his office, which was refused, except to apply upon the entire amount due from the building, and defendant threatened to shut off the water from the building. Thereupon the complainant filed this bill for a permanent injunction against such action, and obtained a decree.

*The Charter:* The defendant was organized under Act No. 243 of the Laws of 1869. It is a special act, and its

provisions, so far as they relate to this question, are as follows:

"Sec. 6. It shall be the duty of said commissioners to examine and consider all matters relative to supplying said village of Marquette with a sufficient quantity of pure and wholesome water for domestic use; also, to provide suitable and efficient means for· the extinguishment of fires."

Section 10 confers the power upon, and makes it the duty of, the commissioners to purchase such lands and materials, and construct such reservoirs, buildings, machinery, and fixtures, as shall be deemed necessary to furnish an ample supply of water for public and private use.

"Sec. 13. Said commissioners shall, from time to time, cause to be assessed the water rate to be paid by the owner or occupant of each house or other building having or using water, upon such basis as they shall deem equitable; and such water rate shall be a continual lien until paid, upon such house or other building, and upon the lot or lots upon which such house or other building is situated.

"Sec. 14. Said commissioners shall have power to make and enforce all necessary by-laws and regulations for the collection of said water rates, either by the appointment of collectors to demand the same, requiring payment at the office, shutting off the water, or by a suit at law before any court of competent jurisdiction, or by sale of the lot or premises upon which such rates shall have become a lien: *Provided,* that such sales shall be conducted in the same manner and have the same force and effect of sales of lots delinquent for village taxes; *and provided further,* that the attempt to collect said rates by any process above mentioned shall not in any way invalidate the lien upon the said lot or premises."

"Sec. 24. The said commissioners are hereby invested with full power to make and enforce such by-laws, regulations, and ordinances as may be necessary to carry into effect the object and ·intent of this act, and to supply any mode or power not already specified herein, and shall cause all such by-laws, regulations, and ordinances to be entered in a book to be kept for that purpose, and signed

by the president and secretary, which, when so entered and signed, shall be evidence in any court of justice."

*Rules and Regulations:* Rules and regulations were adopted by the board, to the number of 13. So far as they are essential to this controversy, they are as follows: Rule 2 provides that—

"All applications for a permit to connect service pipe with the distributing pipe must be made at the office of the board, by *the owner of the premises, or some person duly authorized by him,* and the sum of $10 paid in advance for permit, service cock, stop cock, and a service pipe one-half inch in diameter from the street main to the outer edge of the sidewalk, including the laying of the same."

This rule further states fully what the application must contain. Rule 3 provides a penalty for misrepresentation, or use of water without permit, etc. Rule 4 is as follows:

"Water rates are due and payable in advance at the office of the treasurer of the board on the first days of May and November in each year. Ten per cent. will be added if not paid within 30 days thereafter, and the water shut off without notice, and not turned on again except upon the payment of all arrearages, and, in addition thereto, the sum of two dollars for closing and opening the street stop cock. After expiration of time allowed for payment without addition of the 10 per cent. penalty, the same shall be paid only to the secretary of the board."

Rule 5 relates to private hydrants for fire use. Rule 6 provides that the employés of the board must have free access at proper hours to all parts of every building, to examine pipes and fixtures, and ascertain whether there is any unnecessary waste of water. Rules 7 and 8 refer to plumbers. Rule 9 provides for the laying of service pipes, and the insertion of stop cocks therein. It is unnecessary to refer to the other regulations.

*Contentions of the Parties:* Complainant insists that he is entitled, upon paying or tendering his water rates, to be furnished with water, and that defendant has no right to shut off the water from his office because other

tenants in the building are delinquent. The defendant insists that it has the right to deal solely with the owners of buildings, and charge the entire amount against such owners, and to proceed in any of the methods provided by its charter for enforcing payment. The learned circuit judge held with the complainant, basing his opinion upon two facts: *First*, that there is no rule of the board declaring that it will deal with the owners only in the rendering of its bills and collecting of its rates; and, *second*, that the defendant has, by its practice in granting permits and rendering bills, elected to treat the complainant and those similarly situated as water takers so long as they pay the rates and comply with its regulations.

*Hill & Rood* (*A. B. Eldredge*, of counsel), for complainant.

*Clark & Pearl*, for defendant.

GRANT, J. (*after stating the facts*). The charter of the defendant provides for furnishing water to the *owners or occupants* of houses and other buildings. It does not contemplate that the defendant shall furnish water to each tenant who occupies a separate room in any house or building. It also provides various methods for enforcing collection of the rates. Counsel for complainant concede that the rates are a lien upon the building, and that the building can be sold for nonpayment of the rates by any tenant. The rules and regulations provide for dealing with the *owners*, and not with tenants. The application is required to be made by the *owner or some person duly authorized by him*. The defendant has supplied only one service pipe from the street main to the building, and has provided for one shut-off in the street. This has been the universal custom. It is not, and cannot be, contended that defendant, under its charter, is not vested with the power and right to treat alone with the owner or occupant of the building as an entirety. If such owner or occupant rents rooms to tenants, he has not the right, under the charter, to compel the defendant to deal with his tenants,

and to collect the rates from them. Morrison & Scott, in their leases with their tenants, recognize that they are liable to the defendant, and therefore provide that their tenants must pay for the use of the water. The defendant has made no rule or regulation authorizing its officers or employés to deal with tenants, or to collect from them. The superintendent has done this as an accommodation to owners, and without authority, except as it may be implied from his course of business, known to its officers. Their practice in this regard, however, has not been uniform, and in some instances it has, at the request of property owners, assessed the rates to their tenants, but with the express agreement that the owner should pay if his tenants were delinquent. We do not think that this custom can be construed into a regulation perpetually binding upon the defendant. Until the difficulty arose over the nonpayment of rates by some of the tenants of the Nester Block, no provision had been made for shutting off the water in each room. The only method, therefore, for enforcing payment by shutting off the water, was by the use of the shut-off in the street. Morrison & Scott now seek to fasten this duty upon the defendant by furnishing, at their own expense, shut-offs, with locks and keys, in each room, tendering the keys to the defendant, and thus forcing it to relieve them from the collection of the rates. The charter authorizes the defendant to make all necessary rules and regulations for collecting its dues. We see nothing unreasonable in the method which it was pursuing.

The authorities cited in behalf of complainant do not sustain his contention. In *Red Star Line Steamship Co.* v. *City of Jersey City*, 45 N. J. Law, 246, the sole question was the right of the company to charge consumers with the cost of expensive meters, and it was held that no such right was conferred by the charter. In *U. S.* v. *American Waterworks Co.*, 37 Fed. 747, the waterworks ordinance provided that the company should furnish water to its citizens residing along the line of its

mains, at certain rates, and at a tariff for *dwelling houses*
according to the number of rooms, and other buildings of
different kinds. The United States reservation known as
"Fort Omaha" contained dwellings for officers, and other
buildings. The United States claimed the right to be
furnished as a single consumer for the entire reservation,
including all its buildings. It was held that the company ·
had the right to treat *each building* separately. In
*Lumbard* v. *Stearns*, 4 Cush. 60, the act under which the
water company was organized was attacked as unconsti-
tutional because it contained no express provision require-
ing the corporation to supply all families and persons who
should apply for water, on reasonable terms. It was
contended that it might supply some houses and lots, and
refuse to supply others. Chief Justice Shaw said, "This
would be a plain abuse of their franchise." In *McCrary*
v. *Beaudry*, 67 Cal. 120, the water company assumed
the right to shut off the water, without any reason, from
the *owner* of the premises. In *Price* v. *Irrigating Co.*,
56 Cal. 431, the defendant was organized "to furnish,
sell, give, and supply water to any person or corporation,
for irrigation, mechanical, or other purposes." It refused
to supply plaintiff with water, claiming the right to
appropriate all the water to its own use, "as another sort
of corporation." In *Young* v. *City of Boston*, 104 Mass.
95, the charter required the city to furnish water to "*the
occupant of any tenement.*" An ordinance was passed
by the city, providing for the use of water in "model
houses," so called. These were similar to apartment
houses or flats. A model house was one of those apart-
ments used and occupied as a separate tenement. The
city sought to deprive such tenant of the use of water.
It was held that "this model lodging house was a 'tene-
ment,' within the meaning of the ordinance." In *Wood*
v. *City of Auburn*, 87 Me. 287, the city had purchased
the waterworks, had accepted payment for six months in
advance from the complainant, who was the *owner* of
the tenement building, and sought to shut off the water

for the nonpayment of rates before the city purchased. It was held that the city, having accepted payment in advance, could not shut off the water for an old debt.    In *State* v. *Butte City Water Co.*, 18 Mont. 199, the *owner* of the building had given an order upon the defendant to the tenant to supply him with water.    The tenant was in possession of, and required and demanded the use of water for, the entire premises.    The company refused to deal with the tenant, or to let him have water, notwithstanding the tender of payment for the entire building.

It needs no argument to show that these authorities are not decisive upon the question before us.

We find nothing in the action of the defendant which was unreasonable, or which will result in depriving complainant or any other tenant of the use of water.    The object is apparent,—to relieve Morrison & Scott of the collection of the rates from their tenants, and to impose that duty upon the defendant.

The decree is reversed, with the costs of both courts, and the bill dismissed.

The other Justices concurred.